**UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF KENTUCKY
BOWLING GREEN DIVISION
CRIMINAL ACTION NO. 1:25-CR-00014-GNS-HBB**

**UNITED STATES OF AMERICA**                                                                 **PLAINTIFF**

**VS.**

**CHAD L. DELUCENAY**                                                                        **DEFENDANT**

### FINDINGS OF FACT, CONCLUSIONS OF LAW, AND RECOMMENDATION

Defendant Chad Delucenay is charged with two counts of sexual exploitation of a minor,[1] a single count of distribution of child pornography[2] and a single count of possession of child pornography.[3]

Delucenay moves to suppress statements he made to law enforcement officers during questioning.[4]  The motion is referred to the undersigned for recommended disposition.[5]  The United States filed a response in opposition and a motion to require a more fulsome disclosure of the basis for the motion.[6]  Delucenay replied to the United States' response and motion.[7]  The undersigned denied the United States' motion for disclosure.[8]

On February 6, 2026, the undersigned conducted an evidentiary hearing.  Testifying during the hearing were Special Agent Ryan Chamberlain of Homeland Security Investigations and Larry

---

[1] In violation of 18 U.S.C. §§ 2251(a) and 2251(e).
[2] In violation of 18 U.S.C. §§ 2252A(a)(2) and 2252A(b)(1).
[3] In violation of 18 U.S.C. §§ 2252A(a)(5)(B) and 2252A(b)(2).
[4] DN 20
[5] DN 22.
[6] DN 23, 24.
[7] DN 26, 27.
[8] DN 28.

and Janice Delucenay, the Defendant's parents.  Defendant planned to call Dr. Eric Drogin as an expert witness by remote video; however, technical difficulties prevented him from appearing. Consequently, the hearing was continued until February 25, 2026, and resumed for the purpose of Dr. Drogin's testimony.

Delucenay contends that his inculpatory statements to law enforcement investigators should be suppressed because his rights under the Fifth Amendment to remain silent and the Sixth Amendment to have the assistance of counsel were denied to him.  He argues "law enforcement officials exploited an intellectually compromised person by employing objectively coercive means that overwhelmed his will and motivated him to make incriminating statements for more than four hours straight."[9]

Evidence Considered

In early May of 2023, the Kentucky State Police received several tips from the National Center for Missing and Exploited Children that an individual was uploading images and videos of child sexual material to a Synchronoss cloud storage account.  Several of the images appeared to involve children under age 12.[10]  KSP obtained a search warrant for the Synchronoss account and learned the identity of Delucenay as the account owner, as well as his residential address.[11]

KSP then obtained a state search warrant for Delucenay's residence which it executed on June 29, 2023.[12]  KSP officers and Department of Homeland Security agents participated in the search.  Delucenay and his parents were home at the time.  Delucenay, age 34, was escorted outside to an unmarked government vehicle for an interview by KSP Detective Adam Hutchison and HSA

---

[9] DN 45, p. 1.
[10] DN 44, pp. 1-2.
[11] *Id.* at p. 2.
[12] *Id.*

Special Agent Chamberlain.[13]  He was not arrested at that time nor was he placed in handcuffs; however, he was detained.[14]  The interview was audio recorded and encompasses approximately four hours; however, not all of that time represented questioning.[15]  A certified transcription of the interview is filed of record conventionally.[16]

Before advising Delucenay of his *Miranda* rights, the agents spent approximately 14 minutes speaking with him and obtaining identifying information.  They also discussed why they were there and inquired about his electronic devices and how to access them.  Delucenay did make general statements about not being raised to be a bad person and wanting "to get away from all the fake stuff on here, like, porn and stuff"[17] but the agents did not specifically question him about illegal activity nor does he appear to have made any directly incriminating statements.  After that initial 14 minute period he was advised of his rights and responded as follows:

> *Det. Hutchison*:  Let – let me – let me read this to you real quick, Chad.  Okay?
>
> *Delucenay*:  Okay.
>
> *Det. Hutchison*:  Anytime we interview anybody – okay? – we're always required to read them their rights first.  Okay?
>
> *Delucenay*:  Yeah.  I understand.
>
> *Det. Hutchison*:  This is what we do.  Okay?
>
> *Delucenay*:  Yeah.  I understand that.
>
> *Det. Hutchison*:  I'm sure you've seen it on TV and stuff.
>
> *Delucenay*:  Yeah.  I understand that.
>
> *Det. Hutchison*:  So let me – let me just read this real quick.  And if you have any questions, you ask me.  And then, after that, you know, if you want to hear some

---

[13] *Id.*
[14] DN 36, pp. 19, 33.
[15] *Id.* at pp. 18-19.
[16] DN 35.
[17] DN 35, Def. Ex. 2, Vol. 1 at p. 12.

more about what we want to talk about, then – then we'll go forward with that. Okay?

*Delucenay*:  (No audible response.)

*Det. Hutchison*:  But let me just get this out of the way real quick.  All right?  You do have the right to remain silent.  Anything you say can and will be used against you in court.  You have the right to consult with an attorney and have an attorney present during questioning.  If you cannot afford an attorney, one can be provided to you before questioning at no cost.  Do you understand these rights?

*Delucenay*:  Yes.

*Det. Hutchison*:  Okay.  With these rights in mind, do you till with to speak with us about –

*Delucenay*:  Oh, absolutely.

*Det. Hutchison*:  – what we're talking about?

*Delucenay*:  Yeah.  I mean –

*Det. Hutchison*:  Okay.

*Delucenay*:  I just – like I said, I just –

*Det. Hutchison*:  Like I said, that's just protocol, we always have to get out.

*Delucenay*:  I just – I just need help.  That's what I need.  I mean, I need to get on medication.  That's what I need.  I mean, I need to get on medication.

*Det. Hutchison*:  All right.  Well, all right.

*Delucenay*:  That's what I need.

*Det. Hutchison*:  So here's what we're gonna to do.  We're gonna talk today.  We're gonna talk today and figure out what's going on and figure out what kind of help we can get you.  Okay?

*Delucenay*:  Medication's the biggest thing, really.

*Det. Hutchison*:  All right.  So –

*Delucenay*:  That's what I feel like, I mean.[18]

---

[18] *Id.* at pp. 16-18.

After agreeing to talk with the investigators, Delucenay continued to discuss his desire for medication and history of having heard voices in his head.[19] Detective Hutchison asked Delucenay how long he had been involved with pornography. Delucenay was unable to recall when, but speculated it began when he was in high school.[20] Detective Hutchison began discussing the Synchronoss cloud account and noted some of uploaded photos depicted subjects who were "questionable in age."[21] Delucenay detoured the conversation again to the topic of having heard voices and his need to "get back on medication or find something stronger."[22] Detective Hutchison asked him if he had ever been diagnosed with anything, and Delucenay told him he did not know, but had been in special education in school.[23] Detective Hutchison asked if he graduated from high school, and Delucenay stated he received a GED.[24] Delucenay talked for a few more moments about his work history and desire to find a better job when Detective Hutchison steered the conversation back to the issue of pornography and the images that had been reported to law enforcement.[25] Delucenay stated that he knew that it was wrong, but again that he heard voices because he was not medicated.[26] Detective Hutchison asked Delucenay to "kind of walk me through how – where and how you would find images of nude girls that are under 18."[27] Delucenay answered "there's a lot of apps that are doing that honestly."[28] Detective Hutchison asked about cell phone application programs (a/k/a "apps"), and Delucenay again veered off topic to discuss

---

[19] *Id.* at pp. 18-19.
[20] *Id.* at pp. 19-20.
[21] *Id.* at pp. 20-21
[22] *Id.* at p. 21.
[23] *Id.* at pp. 21-22.
[24] *Id.* at p. 22.
[25] *Id.* at pp. 23-24.
[26] *Id.* at p. 25.
[27] *Id.*
[28] *Id.*

hearing voices and that he needed medication.[29]    Detective Hutchison again steered the conversation back to the apps Delucenay had used.[30]

Detective Hutchison then returned to the topic of the Synchronoss account and his finding images and videos dating back several months depicting underage girls.  Delucenay stated he knew "for a hundred percent fact it is wrong" but "the voice in my head, that's controlling me.  It's like you trying to pull me, and he's trying to pull me.  Who's the strongest one that's gonna pull me?"[31] Detective Hutchison inquired as to the youngest child Delucenay had seen in the videos, and Delucenay indicated he believed 14.[32]    Detective Hutchison continued the conversation with questions about the apps and electronic devices Delucenay used to access the images.  For the next several minutes Delucenay talked about his dissatisfaction with his life, interspersed with additional comments about voices and his need for medication.[33]  Detective Hutchison then asked Delucenay if he had ever been tempted to act on his urges in the presence of children, and Delucenay said he had not.[34]

Agent Chamberlain later took over the questioning and spent time discussing how Delucenay located the child pornography.  Delucenay stated that he would search the internet for adult pornography and "I've gone to normal sites, like your adult stuff, and it'll pop up with different ads."[35]    Agent Chamberlain challenged Delucenay's explanation, advising that adult pornography was legal and law enforcement worked with those types of websites to ensure that no child pornography was available.[36]  Delucenay continued to claim he accessed child pornography

---

[29] *Id.* at pp. 26-27.
[30] *Id.* at pp. 26-30.
[31] *Id.* at pp. 30-31.
[32] *Id.* at p. 31.
[33] *Id.* at pp. 32-48.
[34] *Id.* at p. 58.
[35] *Id.* at p. 93.
[36] *Id.* at pp. 94-95.

through adult websites, and Agent Chamberlain asserted that Delucenay was not being honest with him and that they needed to "start fresh."[37]  Delucenay conceded that he would use the Firefox search engine or an app to search for "child porn."[38]  He stated he used Firefox because it did not filter results.[39]  Agent Chamberlain then engaged Delucenay in an explanation of how he went about searching for and accessing child pornography on the internet and uploading the images and videos.

During this conversation, Agent Chamberlain challenged Delucenay's repeated references to being directed by voices in his head, saying he was "going down that same road."[40]  He advised Delucenay that honesty and accountability were important, that he did not find his contentions of being motivated by voices in his head to be credible, and appealed to Delucenay's status as a "fully functioning member of society."[41]  Eventually Delucenay indicated that his actions were not fully driven by hearing voices:

> *Agent Chamberlain*:  So I need you to be honest.  And I need you to – if it's something that, "Hey, I had an urge to do this, and I – I did it" – if that's the case, then I need you to be upfront and honest with me.  Okay?
>
> *Delucenay*:  Yeah.  I mean, I've made mistakes on it sometimes.
>
> *Agent Chamberlain*:  Okay.
>
> *Delucenay*:  You know.
>
> *Agent Chamberlain*:  That's what we're asking.
>
> *Delucenay*:  I've also had – I will also add, too, I've had voices.  But, also, at times, there's times where I've made mistakes myself.[42]

---

[37] *Id.* at p. 99.
[38] *Id.* pp. 99-100.
[39] *Id.* at p. 100.
[40] *Id.* at p. 107
[41] *Id.* at p. 109.
[42] *Id.* at p. 111.

From that point on in the interview, Delucenay makes no further reference to being directed by voices. Questioning moved on to Delucenay's surfing live video feeds, which sometimes progressed to messaging, and then sometimes to receiving photos of nude children.[43] Delucenay also explained that sometimes he would reciprocate with his own photos in order to receive more.[44]

Agent Chamberlain then questioned Delucenay about an incident involving his niece. Delucenay initially claimed he could not remember any of the details of the allegations.[45] Agent Chamberlain pressed Delucenay for more details, and Delucenay's recollection improved. Delucenay recalled that "it was at night, and they were spending the night."[46] He recalled he and his niece were talking, and he did not recall her age (he later estimated 10).[47] He then recalled that "she had her pants down."[48] When asked why her pants were down, Delucenay indicated he had asked her.[49] He denied wanting to see how far the incident would go, describing it as "kind of like you being a doctor, and kind of, you know, examining –."[50] After additional questioning, Delucenay revealed that he had asked to take a photograph of his niece's vagina, and told her not to tell anyone.[51]

Agent Chamberlain later asked Delucenay if there were any child pornography photos on his phone involving someone he knew.[52] Delucenay initially denied that there were any, but conceded that "there might be one."[53] When asked who, he indicated there were "one or two.

---

[43] *Id.* at p. 124.
[44] *Id.* at p. 130.
[45] *Id.* at p. 146.
[46] *Id.* at p. 147.
[47] *Id.* at pp. 147-48.
[48] *Id.* at p. 148.
[49] *Id.* at pp. 148-49.
[50] *Id.* at p. 149.
[51] *Id.* at p. 154.
[52] *Id.* at p. 162.
[53] *Id.* at p. 163.

Umm. Just a friend of mine."[54] He explained that his ex-girlfriend had a daughter and he had taken a photo of scratches on her back.[55] He elaborated that the daughter was 10 and in the bathtub. Her mother did not have her cell phone with her, so he used his to take the photo because her mother "was worried about her back."[56] When asked about the nature of the photograph, Delucenay indicated it was of "her whole back, and stuff like that."[57] Agent Chamberlain pressed for an elaboration of what "stuff like that" meant, and Delucenay stated it was "her whole back, her butt, stuff like that, and other parts."[58] He eventually revealed that he had also taken a photograph of her vagina.[59] On further questioning, he disclosed that he had taken a photograph of the child's vagina when she was sitting in her room watching television.[60] He explained that she wet the bed and wore a diaper.[61] He recalled asking her to take off the diaper, and indicated this happened on more than one occasion.[62] Sometimes she took it off, and sometimes he did, and he would take photos of her vagina. On further questioning he conceded that sometimes he had her "spread eagle" for the photos, "but the majority of them were just, you know – for example, this was the bed, for example, just legs straight out."[63]

Agent Chamberlain asked Delucenay if he had photos of any acquaintances other than the two girls already discussed, and Delucenay that he "had a friend of mine's daughter.[64] He stated

---

[54] *Id.* at p. 163.
[55] *Id.*
[56] *Id.* at p. 165.
[57] *Id.*
[58] *Id.*
[59] *Id.* at p. 166.
[60] *Id.* at pp. 166-67.
[61] *Id.* at p. 167.
[62] *Id.* at pp. 168-69.
[63] *Id.* at pp. 168-170.
[64] *Id.* at p. 179.

he asked his female friend to send him photographs.[65]  He stated she sent the photos because "she has a crush on me."[66]  He stated the photos were of their "private parts."[67]

Throughout the questioning, Delucenay never indicated a desire to terminate the interview or consult with an attorney.  The investigators maintained a friendly and largely sympathetic tone during the questioning, and Delucenay does not appear to have been experiencing significant distress.  He was generally willing, even eager, to speak with the investigators.  At various points he initially made denials or minimized his answers to questions but provided increasingly revealing answers on additional questioning.  The additional questioning, however, was not unduly persistent or confrontational, it was simply thorough.

Turning to the evidentiary hearing, Agent Chamberlain characterized Delucenay during the questioning as "calm, very talkative, and overall, I thought the atmosphere inside that vehicle was – you know, the environment was calm enough to have a conversation."[68]  He stated that neither he nor Detective Hutchison threatened Delucenay.[69]  He also testified that Delucenay was engaged and appeared to understand what was happening.[70]

During the interview, Agent Chamberlain can be heard telling Delucenay that he did not suffer from a mental disorder.  On cross examination, Agent Chamberlain stated he drew this conclusion at that time from fact that Delucenay had a driver's license and seemed "very respectful, polite, had a conversation that I would, you know, in all accounts say that he was a very competent 34-year-old."[71]  As to the issue of Delucenay's references to hearing voices in his head, Agent Chamberlain testified that Delucenay never claimed to have been hearing voices contemporaneous

---

[65] *Id.*
[66] *Id.* at p. 182.
[67] *Id.* at p. 183.
[68] DN 36, p. 20.
[69] *Id.*
[70] *Id.* at pp. 19-20.
[71] *Id.* at pp. 36-37.

with the interview, and that he did not appear at any time to be responding to internal stimuli.[72] Agent Chamberlan testified that, subsequent to the interview, he learned that Delucenay was a certified first responder with the Fountain Run Fire Department.  He verified with the department chief that, in order to obtain certification, Delucenay had undergone what Agent Chamberlain would describe as "pretty extensive training in order to earn the certificate of firefighter."[73]

Defendant's father, Larry Delucenay, testified that law enforcement officers arrived at the home to execute the search warrant in what he characterized as "full tactical gear," including battering rams and automatic weapons.[74]  He also testified that when his son was being lead out of the house he advised the officers that "he requires an attorney."[75]  His own phone was confiscated and he was unable to call an attorney himself.[76]  As to the Defendant's work history, he testified that it had largely involved washing dishes.[77]  When asked about the Defendant's certification as a firefighter, he testified that "he did some of that" but that he didn't know directly.[78]

Defendant's mother, Janice Delucenay, also testified that she informed the investigators that her son needed an attorney, and her phone was confiscated as well.[79]  She stated that the Defendant struggled all through school and did not graduate from high school in Florida until he was 19.[80]  She further testified that he was unable to pass an examination required for graduation, but was granted an exception whereby he was permitted to graduate because he had done the classwork.[81]  She described his work history as involving jobs that were "pretty menial."[82]  As to

---

[72] *Id.* at pp. 41-42.
[73] *Id.* at pp. 27-28
[74] *Id.* at p. 46.
[75] *Id.* at p. 47.
[76] *Id.*
[77] *Id.* at p. 50.
[78] *Id.*
[79] *Id.* at p. 54.
[80] *Id.* at p. 55.
[81] *Id.* at pp 55-56.
[82] *Id.* at p. 56.

his position with the fire department, she described his involvement as relating to washing the fire trucks and going on practice runs.[83]  He had been awarded a scholarship for EMT training, but withdrew after a few months due to problems with reading comprehension.[84]  She described him as lacking intellectual and developmental skills commensurate with his age and a person eager to please in order to appear more intelligent.[85]  Both parents testified, however, that the Defendant is not subject to any guardianship or conservatorship.[86]

Dr. Eric Drogin is a clinical and forensic psychologist, holding a bachelor's degree in psychology and a PhD in clinical psychology.[87]  He is board certified in forensic psychology by the American Board of Professional Psychology and the American Board of Forensic Psychology.[88]  Although not appearing as an expert on any legal issue, Dr. Drogin also holds a law degree.[89]  Dr. Drogin testified that he had several meetings with Delucenay and his family to learn about him.  He stated he had also reviewed clinical/medical documentation, educational materials, and the audio recording and transcription of the interview.[90]  As to Delucenay's educational background, Dr. Drogin testified that Delucenay presented a learning disability with testing scores resting in the borderline intellectual functioning.[91]  Clinical records reflected diagnoses of schizophrenia and an intellectual development disability.[92]  Based upon the records and Dr. Drogin's own testing, he concurred with the diagnosis.[93]  Due to these conditions, it was Dr.

---

[83] *Id.* at p. 57.
[84] *Id.*
[85] *Id.* at pp. 59-60.
[86] *Id.* at pp. 51, 54.
[87] DN 37, p. 4
[88] *Id.* at p. 6.
[89] *Id.* at p. 4.
[90] *Id.* at pp. 7-8.
[91] *Id.* at p. 8.
[92] *Id.* at pp. 8-9.
[93] *Id.* at p. 9.

Drogin's opinion that Delucenay could be more susceptible to police interrogation techniques than an individual without those conditions.[94]

Discussion

> The Fifth Amendment guarantees that "[n]o person . . . shall be compelled in any criminal case to be a witness against himself." U.S. Const. amend. V. In the seminal decision of *Miranda v. Arizona*, 384 U.S. 436, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966), the Supreme Court established procedural safeguards to protect the core of the right against self-incrimination. These safeguards require law enforcement officers to inform suspects of their rights—colloquially known as *Miranda* warnings—before questioning. These warnings advise individuals that: (1) they have a right to remain silent, (2) anything they say can and will be used against them in a court of law, (3) they have the right to consult with a lawyer before interrogation and to have the lawyer present during interrogation, and (4) if they cannot afford an attorney, one will be appointed for them before questioning begins. *Id.* at 467-73.

*United States v. Guerrero*, 168 F.4th 454, 460 (6th Cir. 2026). Unless a suspect knowingly, voluntarily, and intelligently waives these rights, any statements made will be excluded as a result of an involuntary waiver. *Machacek v. Hofbauer*, 213 F.3d 947, 954 (6th Cir. 2000). Waiver is voluntary when "it was the product of a free and deliberate choice rather than intimidation, coercion, or deception." *Moran v. Burbine*, 475 U.S. 412, 421 (1986). Waiver is knowing and intelligent when it is "made with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it." *Id.*

Here, there is no factual dispute that the investigating officers read the required advisement of rights to Delucenay, or that Delucenay indicated a willingness to waive the rights and speak with the investigators. Delucenay contends that the waiver was ineffective because the investigators spoke with him for several minutes before advising him of his rights and thus lulled him into continuing to speak with them, that he lacked the intellectual ability to fully understand the nature of his rights or the consequences of waving them, and that the investigators utilized

---

[94] *Id.* at p. 20.

13

questioning techniques that took advantage of his diminished intellectual capacity to the extent that the questioning was coercive.[95]

1.   Pre-*Miranda* statements.

Delucenay notes that the audio recording begins while he and Detective Hutchison are already speaking.  He characterizes the nature of the conversation where he commented that he wanted to get away from "porn and stuff" demonstrates that Detective Hutchison had already begun interrogating him, as opposed to simply gathering information of an administrative nature.[96] He also argues that, before apprising him of his rights, Detective Hutchison was already priming him to confess.[97]  Delucenay does not further develop his argument regarding the timing of the *Miranda* advisement other than to contend it served as a segue to his later confession, but regardless any incidental questioning preceding the advisement is of no consequence insofar as suppression is concerned.  The questioning does not implicate the interrogation approach variously referred to as "question-first," "midstream-*Miranda*," or "*Miranda*-in-the-middle."  *Guerrero*, 168 F.4th at 463.   In *Missouri v. Seibert*, the Supreme Court observed that "the object of question-first [was] to render *Miranda* warnings ineffective by waiting for a particularly opportune time to give them, after the suspect has already confessed."  542 U.S. 600, 611 (2004).  Delucenay does not assert that he made any manner of confession prior to the rights advisement and, as in *Guerrero,* "[t]he agents could not have pressured [him] to repeat any confession about his crimes because when they administered his *Miranda* warnings, he had not yet confessed."  168 F.4th at 463.

---

[95] DN 45, pp. 9-15.  Delucenay also refers to the fact that his parents advised the investigators that he needed an attorney and that, because their phones were confiscated, they were unable to contact an attorney on his behalf (DN 45, pp. 3-4).  He does not further develop this argument as a basis for excluding his statements.  Nonetheless, Delucenay's parents have no standing to assert his right to counsel.  "Sixth Amendment rights are at bottom *personal* to the accused" and one may not assert the right on behalf of another.  *United States v. Dobson*, 626 F. App'x 117, 123 (6th Cir. 2015) (quoting *United States v. Blair*, 661 F.3d 755, 772 (4th Cir. 2011)).
[96] DN 45, pp. 10-11.
[97] *Id.*

2.   <u>Whether the waiver of rights was made voluntarily, knowingly, and intelligently.</u>

For a waiver to be valid, "the relinquishment of the right must have been voluntary in the sense that it was the product of a free and deliberate choice rather than intimidation, coercion, or deception." *Moran*, 475 U.S. at 421.  Additionally, "the waiver must have been made with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it." *Id.*  Finally, "[o]nly if the 'totality of the circumstances surrounding the interrogation' reveal both an uncoerced choice and the requisite level of comprehension may a court properly conclude that the *Miranda* rights have been waived." *Id.* (quoting *Fare v. Michael C.*, 442 U.S. 707, 725 (1979)).  The determination includes consideration of the suspect's age, experience, education, background, and intelligence and whether the suspect has the capacity to understand the warnings given him, the nature of his Fifth Amendment rights, and the consequences of waving them.  *Fare*, 442 U.S. at 725.  The government must prove the validity of a waiver by a preponderance of evidence.  *Colorado v. Connelly*, 479 U.S. 157, 168 (1986).

Delucenay argues that he lacked the intellectual capacity to understand the nature of his rights and the consequences of waving them.  He believes his diagnoses of schizophrenia and what he characterizes as "borderline mental retardation" demonstrate limitations in his abilities to think and understand complex issues.[98]  He notes further that he was unable to pass the standardized test required to graduate from high school and that, although he is in his mid-thirties, he has always lived at home with his parents and is incapable of living independently.[99]

In support of the argument that Delucenay understood the waiver of rights, the United States points to the transcript of the interview as demonstrating Delucenay's understanding of the

---

[98] *Id.* at pp. 2, 9.
[99] *Id.*

15

warning.[100]  It also notes Agent Chamberlain's testimony that Delucenay indicated he had a GED and appeared to understand the nature of the questioning.[101]  The undersigned notes that at one point in the interview when discussing what sort of apps he was using to find photographs of underage children, Delucenay volunteered "right now, I'm sitting here, like, a sober-type person. I know it's wrong." and "this is a huge wake-up call, 'cause I want to change my life."[102]

"There is no clearly defined minimum level of intelligence required for a suspect to understand and waive his *Miranda* rights."  *United States v. Robinson*, No. 3:13-CR-50-R, 2014 U.S. Dist. LEXIS 46254, at *7 (W.D. Ky. Mar. 5, 2014); *see United States v. Cummings*, No. 21-cr-20606, 2022 U.S. Dist. LEXIS 121091, at *23 (E.D. Mich. July 8, 2022) (quoting *Clark v. Mitchell*, 425 F.3d 270, 283 (6th Cir. 2005)) ("As the Sixth Circuit has found, having mental deficiencies of being of 'low average intellect . . . is not dispositive.'").  Consequently, a mental disability is only one factor in determining whether a defendant's confession is voluntary, although it does call upon the Court to more carefully examine the totality of circumstances surrounding the confession.  *Robinson*, 2014 U.S. Dist. LEXIS 46254, at *7-8.

"Both the voluntariness and comprehension aspects of the waiver inquiry should be examined 'primarily from the perspective of the police,' such that where '[the] police had no reason to believe that [the defendant] misunderstood the warnings, . . . there is no basis for invalidating [the] *Miranda* waiver.'"  *United States v. Al-Cholan*, 610 F.3d 945, 954 (6th Cir. 2010) (quoting *Garner v. Mitchell*, 557 F.3d 257, 263 (6th Cir. 2009)).  This is because the "relevant constitutional principles are aimed not at protecting people from themselves but at curbing abusive practices by public officers . . . .  It would seem to follow that the question is not whether if [the defendant]

---

[100] DN 44, pp. 5-6.
[101] *Id.* at p. 9.
[102] DN 35, p. 26.

16

were more intelligent, informed, balanced, and so forth he would not have waived his *Miranda* rights, but whether the police believed he understood their explanation of those rights . . . ." *Garner*, 557 F.3d at 262 (quoting *Rice v. Cooper*, 148 F.3d 747, 750-51 (7th Cir. 1998)). Moreover, the standard is not whether the suspect knew and understood every possible consequence of the waiver, but rather whether he knew he could choose not to speak with the law enforcement officers, speak to them only with counsel present, or discontinue the questioning at any time. *United States v. Ray*, 803 F.3d 244, 266 (6th Cir. 2015). In making this determination, the Court is entitled to consider whether an audio recording of the interview supports an officer's assessment of a defendant's lucidity and comprehension. *See United States v. Fein*, 843 F. App'x 765, 770 (6th Cir. 2021) ("The court was able to rely upon an audio recording of the interview and [the officer's] testimony that [the defendant] appeared competent during the interrogation. It noted that [the defendant] had a conversational tone, seemed to understand his situation, and responded appropriately to questions."); *see also United States v. Cooper*, No. 7:16-01-DCR. 2016 U.S. Dist. LEXIS 66412, at *17-18 (E.D. Ky. May 20, 2016) (considering an audio recording of an interview in determining validity of a *Miranda* waiver). Here, the audio recording of Delucenay's interview corroborates the officer's perception that Delucenay had sufficient intelligence to understand the nature and waiver of his rights. Throughout the interview Delucenay was articulate, appeared to understand the questions asked of him, and asked questions of his own to the investigators.

As to his diagnosis of schizophrenia, Delucenay does not contend that he was suffering from any delusional effects of the condition at the time of his interview with police. To the contrary, Delucenay talked about hearing voices and needing medication in the context of claiming that his past actions were caused by a condition beyond his control. It is clear Agent Chamberlain

viewed this repeated refrain as an effort on Delucenay's part to avoid personal responsibility and he testified there was no indication that Delucenay was, at that time, impaired due to schizophrenia.

3. <u>Whether law enforcement's questioning was oppressive.</u>

"Evidence that a defendant suffered, at the relevant time, from a condition or deficiency that impaired his cognitive or volitional capacity is never, by itself, sufficient to warrant the conclusion that his confession was involuntary for purposes of due process; some element of police coercion is always necessary." *United States v. Newman*, 889 F.2d 88, 94 (6th Cir. 1989). This is because a court must consider the totality of the circumstances. *United States v. Loonsfoot*, No. 2:20-cf-00027, 2021 U.S. Dist. LEXIS 166106, at *15 (W.D. Mich. Aug. 16, 2021) (citing *Colorado v. Connelly*, 479 U.S. 157 (1986)). An officials' conduct is coercive when: (1) the conduct was objectively coercive; (2) the alleged coercion was sufficient to overbear the defendant's will; and (3) the officials' conduct was the crucial motivating factor in the defendant's decision to speak. *Guerrero*, 168 F.4th at 461.

Delucenay does not contend that the investigators engaged in any sort of overt coercion, such as threatening or abusive conduct.[103] To the contrary, he asserts that "[t]he subtle coercion created by Detective Hutchison's repeated assurances that the police were there to help Chad get help with the voices, the suicidal thoughts and the need for medication overwhelmed whatever

---

[103] Delucenay notes in his memorandum that when the officers executed the search warrant they were "in full tactical gear, holding battering rams and armed with firearms that appeared to be automatic weapons." (DN 45 at p. 3). He does not, however, appear to argue that this initial show of force had a coercive effect on him carrying over to the interview in the unmarked police vehicle. The recording of the interview provides no indication of such and, while Delucenay was respectful of the officers, he does not appear intimidated or fearful for his safety. An initial show of police force to ensure their safety is not *per se* coercive. *See, e.g., United States v. Ninsawat*, No. 22-20630, 2023 U.S. Dist. LEXIS 89924, at *35 (E.D. Mich. May 23, 2023) ("There is no question that the government agents presented a show of force when they arrived at the defendant's house to execute the search warrant. They arrived in multiple vehicles and in tactical gear. They brandished their weapons. . . . But there is nothing in the record that supports the idea that the defendant's will was overborn by this show of force. For instance, there is nothing in the interview transcripts that in any way suggests that the questioners deployed improper force or threats of any kind to overbear that defendant's will. The recordings depict calm and cordial conversations.").

slight capacity for self-determination the borderline mentally retarded young man may have possessed."[104] Delucenay further ties this "subtle coercion" to Detective Hutchison's pre-*Miranda* conversation as a ploy to establish rapport and obtain a post-*Miranda* confession.[105]

As an initial point, an investigator's use of "small talk" before asking about criminal activity, even if an effort to build rapport with a suspect, is not inherently improper or coercive. *See Loonsfoot*, 2021 U.S. Dist. LEXIS 166106 at *17-18. It is true that the investigators made statements about getting Delucenay help, but this appears largely in the context of his own statements that he needed help:

> *Det. Hutchison*: All right. Well – well, just – just listen to me for a second, Chad. Okay? We want to cover some things today. We want to clear some things up. That way, we know it's not more serious that what it could be. You know what I'm saying?
>
> *Delucenay*: Which even – even – even if it was, I'd still never do anything. That's my problem.
>
> *Det. Hutchison*: Okay. And that's good.
>
> *Delucenay:* But it's a wake-up call.
>
> *Det. Hutchison:* That's good.
>
> *Delucenay:* But I just need – I need help. I mean –
>
> *Det. Hutchison:* Look – well – and – and we can try to get you some help. Okay?[106]

And as set forth earlier:

> *Delucenay:* I just – I just need help. That's what I need. I mean, I need to get on medication.
>
> *Det. Hutchison:* All right. Well, all right.
>
> *Delucenay*: That's what I need.

---

[104] DN 45, p. 14.
[105] *Id.*
[106] DN 35, p. 16

*Det. Hutchison:* So here's what we're gonna to do. We're gonna talk today. We're gonna talk today and figure out what's going on and figure out what type of help we can get you. Okay?

*Delucenay*: Medication's the biggest thing, really.[107]

The transcript of the interview does not suggest that the investigators were attempting to mislead Delucenay that the objective of the questioning was to determine how they could help him with his child pornography predilection or with his schizophrenia as opposed to investigating a crime. The investigators simply responded to his statements that he needed help in the form of medication with an indication that they would try to help, and this is not objectively coercive action on their behalf.

It is also true that at various points in the interview the investigators employed questioning that appealed to Delucenay's altruism by asking for his help in explaining how he accessed child pornography so that they could be sure it was deleted from the internet,[108] capitalized on his sense of self-worth by characterizing him as a "good guy" and someone with a future ahead of him,[109] and by challenging him to demonstrate integrity.[110] However, "[p]loys to mislead a suspect or lull him into a false sense of security that do not rise to the level of compulsion or coercion to speak are not within *Miranda's* concerns." *Illinois v. Perkins*, 496 U.S. 292, 297 (1990). Moreover, "[t]here is nothing inherently wrong with efforts to create a favorable climate for confession.

---

[107] *Id.* at p. 18.

[108] *See, e.g., id.* at p. 89: *Agent Chamberlain*: So if you can help me, you know, understand how you obtained it, maybe I could recreate that, go in there, and wherever you got it from, maybe I could delete it. *Delucenay*: Right. *Agent Chamberlain*: Ultimately, that would be a wonderful, wonderful thing. *Delucenay*: Yeah, that would be a wonderful – yeah, that would be. *Agent Chamberlain*: So is there anything that you can share with me, in your experience, of how to access that material?

[109] *See, e.g., id.* at p. 108: *Agent Chamberlain*: And, Chad, I think you're a good guy. *Delucenay*: I am. *Agent Chamberlain:* I think you have a future in front of you."

[110] *See, e.g., id.* at pp. 98-99: *Agent Chamberlain*: Chad, listen. I hear that you want – you want help for this. *Delucenay*: Yeah. *Agent Chamberlian*: You want to be accountable. You want to be a standup guy. Okay? *Delucenay:* Absolutely. *Agent Chamberlain*: It starts with integrity. *Delucenay:* Uh-huh. *Agent Chamberlain*: It starts with ownership of – if you've made a mistake, we can work with that. Okay?

Neither 'mere emotionalism and confusion", nor mere 'trickery' will alone necessarily invalidate a confession." *Ledbetter v. Edwards*, 35 F.3d 1062, 1069 (6th Cir. 1994) (quoting *Hawkins v. Lynaugh*, 844 F.2d 1132, 1140 (5th Cir. 1988)). In the present case, the questioning bears none of the hallmarks of objectively coercive behavior, such as physical punishment or threats, deprivation of necessities such as food, drink, or bathroom, unduly lengthy interrogation, or ignoring reluctance to talk or a request for an attorney. *See id.* Moreover, even considering the totality of the circumstances in light of Delucenay's contention that his mental capacity rendered him susceptible to "subtle coercion," the transcript of the interview does not establish that what appears to be standard law enforcement questioning tactics were sufficiently coercive to overbear Delucenay's will.[111]

## RECOMMENDATION

**WHEREFORE**, the undersigned **RECOMMENDS** that the Defendant's motion to suppress statements made to law enforcement officers, DN 20, be **DENIED**.

**H. Brent Brennenstuhl**
**United States Magistrate Judge**

May 22, 2026

---

[111] Delucenay also refers to religious ministering by law enforcement during the questioning. While there was some limited discussion of religion during the interview, the significant majority is reflected in a conversation Delucenay had with an unidentified officer not engaged in the interview after it concluded. DN 35, Def. Ex. 2, Vol. 2 at pp. 302-373. Delucenay engaged in conversation with the officer and expressed that he didn't want to be alive anymore. The officer advised him that he had gotten into trouble and that carried consequences, but the "only way to go is up. And the only way to do that is to trust in the Lord." *Id.* at p. 304. Thereafter the two engaged in a lengthy conversation about religion that had nothing to do with the investigation. Agent Chamberlain spoke with Delucenay again afterward, but it did not involve questioning.

**NOTICE**

Therefore, under the provisions of 28 U.S.C. §§ 636(b)(1)(B) and (C) and Fed. R. Civ. P. 72(b), the Magistrate Judge files these findings and recommendations with the Court and a copy shall forthwith be electronically transmitted or mailed to all parties.  Within **fourteen (14) days** after being served with a copy, any party may serve and file written objections to such findings and recommendations as provided by the Court.  If a party has objections, such objections must be timely filed, or further appeal is waived.  *Thomas v. Arn*, 728 F.2d 813 (6th Cir. 1984), *aff'd*, 474 U.S. 140 (1985).

H. Brent Brennenstuhl
United States Magistrate Judge

May 22, 2026

Copies:  Counsel

22